## STATE v. WALTER MICHAEL SUCIK.[1]

June 9, 1944.

No. 33,733.

*A. M. Cary, Simon Meshbesher,* and *John Ott,* for appellant.

*J. A. A. Burnquist,* Attorney General, *Ralph A. Stone,* Assistant Attorney General, *Michael J. Dillon,* County Attorney, and *Luther Sletten* and *Per M. Larson,* Assistant County Attorneys, for the State.

MAGNEY, JUSTICE.

Defendant, Walter Michael Sucik, was convicted of the crime of murder in the first degree and sentenced to the penitentiary for

[1]Reported in 14 N. W. (2d) 857.

life. He appeals from an order denying his motion for a new trial.

On March 8, 1943, shortly after 12:30 a. m., Ralph Simonson died as the result of a gunshot wound of the left chest. When found, he was lying on his back in the kitchen of the home occupied by defendant and his wife.

The evidence sustains the conviction, and it is not necessary to detail all the facts. Defendant contends that the court erred in permitting certain testimony to be received in evidence and that the prosecutor in his opening statement and in his argument to the jury made certain prejudicial remarks. Enough of the facts pertinent to these questions must be recited so that our determination may be properly understood.

At about 11:45 p. m. on March 7, 1943, defendant, his wife, and Simonson were at a tavern known as John & John's drinking liquor. According to the testimony, defendant said to Simonson, "I finally caught up with you. I know you have been stepping my wife out." Simonson said, "Well, I haven't, Walt, I haven't been stepping your wife out," and defendant responded, "Oh, yes, you have. I know you have been stepping around. I finally caught up with you tonight," and added, "To hell with you. I will get my gun and I will blast the head off of both of yous and Mrs. Sucik." About 12 o'clock that night they left John & John's and went to defendant's home. A short time after they arrived there the subject was again brought up. About 12:30 that night, Cecil A. Selander, a next-door neighbor, was awakened by Mrs. Sucik. She was tugging at the door, ringing the bell, and shouting, "It is me." When Selander opened the inner door, she shouted, "It is me. It is me." When she came in she said, "Call the cops. My husband shot a man. But don't tell them my husband did it." She kept repeating, "Oh, my God, my God." As Selander was reaching for the telephone book, she said, "Perhaps you better call an ambulance instead." She looked out of the window toward her own home and said, "I just know there is going to be a scandal at New Brighton. I will lose my job. I will get fired. I have only worked there a short time." Mrs. Selander asked her where the victim was, and she

said, "In the kitchen," and added, "I wish I had never bought the house, the big baboon." She was also asked where defendant got the gun, and she said, "He has got two of them in the house." When asked how many shots were fired, she said, "One," and when asked what kind of a gun he used, she said, "A shotgun." Then she added, "I just know he is going to die. He has got a bad heart." Just then the police squad car drove up, and Selander ran out to meet it. Mrs. Sucik also ran out of the house and to the police car. She told them, "I am his wife."

During the whole time Mrs. Sucik was in the Selander home she was very excited. She kept repeating, "Oh, my God, my God," paced the floor, wrung her hands, and talked in a very loud voice. She was "considerably worked up." When she came over to the police car, she was jumping and wringing her hands. She walked right behind the police officers as they entered the house. After they had entered she brushed past them and ran toward the kitchen. When she got there she said, "He is dead." She left the kitchen immediately, rushed toward defendant, her arms upraised, and shouted in a very loud voice, "My God, Walter, you have killed him."

Selander called the police department as soon as Mrs. Sucik entered his house and had told what had happened. The officers received the call at 12:30 a. m. and arrived at the Sucik home at 12:33. All the conversations between Mrs. Sucik and the Selanders must have taken place within two or three minutes after the shooting.

Defendant contends that the court erred in receiving in evidence, over objection, the testimony as to what Mrs. Sucik told others about the shooting after it was over, on the ground that it was hearsay and not *res gestae*. He also contends that the court erred in admitting in evidence, over objection, Mrs. Sucik's exclamations, actions, and emotions after the shooting.

As stated, the statements were made by Mrs. Sucik within two or three minutes after the shooting took place. They were therefore substantially contemporaneous with the act of which they were a part. At the time they were uttered she was experiencing nervous

excitement and shock, and it is apparent that her statements were spontaneous and made without reflection. In Meyer v. Travelers Ins. Co. 130 Minn. 242, 244, 153 N. W. 523, 524, this court said concerning such statements:

"* * * The spontaneity accredits them. So it is an essential of a declaration admissible under the *res gestae* doctrine that its spontaneity give the unsworn statement a credit justifying a jury in hearing and weighing and valuing it along with other items of evidence. Spontaneity or the lack of it may be evidenced by the lapse of time between the main act and the declaration, the opportunity or likelihood of fabrication, the inducement to fabrication, the natural excitement of the declarant, the place of the declaration, the presence there of the visible results of the act or occurrence to which the utterance relates. An utterance made in response to a question may be less indicative of spontaneity than an uninvited one. A declaration against interest may indicate spontaneity more certainly than a self-serving one. Time is an important but not definitely controlling consideration. The lapse of time gives an opportunity for deliberation and may be suggestive of a likelihood of fabrication. It may be one minute or many minutes. It may be so great that the law will say that the declaration fails to illustrate or characterize the act and is not a part of the *res gestae.* * * * 'What the law altogether distrusts is not after-speech but after-thought.' "

Tested by the rule set out above, the utterances and actions of Mrs. Sucik were clearly admissible as part of the *res gestae*. Furthermore, there is a large element of discretion vested in the trial court in the matter of admitting or excluding statements offered as part of the *res gestae*. See, 2 Dunnell, Dig. & Supp. § 3300.

Defendant contends that there is no evidence in the record that Mrs. Sucik saw the shooting and that her statement that her husband shot a man was nothing but her opinion or conclusion. In our opinion, there is sufficient evidence to show her presence. When she came to the Selander home, as has already been recited, she told

them that her husband had shot a man, that Selander had better call an ambulance, that the wounded man was in the kitchen, and that her husband had fired one shot from a shotgun. After she came back to her own home, following the policemen, she brushed past them and ran into the kitchen. When she came to the kitchen, she said, "He is dead." Then she rushed toward defendant and shouted, "My God, Walter, you have killed him." Her statements and acts are sufficient proof of her presence at the time and place of the shooting.

The trial court in its memorandum plainly stated the situation thus:

"It is counsel's claim the court was in error in admitting the testimony relating to statements of the wife of defendant as part of the *res gestae*, claiming more particularly that at the time of the shooting the wife was not present, and because of this fact the testimony under no circumstances would be permissible. After a careful reading of the record the court feels that it was an established fact that the wife was present and saw the shooting, and that what occurred at the neighbor's home next door was subsequent thereto, and the question of her statements came squarely within the decisions on *res gestae*."

Defendant complains of statements made by the prosecuting attorney when he outlined the case to the jury and in his final argument. These statements recited the testimony which we now hold was properly admissible. Of course, if there was no error in the admission of this testimony, a recital of it to the jury cannot possibly be prejudicial.

Defendant sets out other specifications of error. In our opinion they are not of sufficient merit to justify a discussion of them. In any event, they cannot change the result.

Affirmed.